PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.

(District Court, S. D. New York. July 10, 1915.)

Equity 2–9, 2–33, 2–149, 3–37.

1. STREET RAILROADS &#8258;49—LEASE—CONSTRUCTION—EXPENDITURES BY LESSEE.

A lease of a street railway system provided that if the lessee should deem it expedient at any time to extend the lines, construct branches, or provide additional equipment, and the lessor should agree to the same, and that the extension or improvement was properly chargeable to capital account, the lessee should provide the money and the lessor should issue to the lessee its securities as agreed upon to cover the "expenditures" so made. Both lessor and lessee became insolvent, and receivers were appointed for each. *Held*, on an accounting between the receivers, that the lessor was not chargeable for materials and supplies purchased by the lessee prior to the receivership for use in making an agreed extension or improvement under such provision of the lease, unless the same had actually been used or "expended."

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. &#8258;49.]

2. STREET RAILROADS &#8258;49—LEASE—CONSTRUCTION—ACCOUNTING BETWEEN RECEIVERS OF LESSOR AND LESSEE.

A long-term lease of a street railway system required the lessee to replace any of the demised premises, or any cars that should be destroyed by fire or other cause. It also provided that for permanent betterments and additional and increased equipment provided by the lessee it should be reimbursed by the lessor. *Held*, on an accounting between the receivers of the lessor and lessee after the lease had been terminated by their insolvency, that the lessor was not chargeable with the cost of new buildings built by the lessee in place of others destroyed by fire, or of new cars purchased, where a larger number had been destroyed by fire, in so far as they were replacements; that if larger and better buildings were constructed or the cars purchased were of a more expensive type, the matter was one for apportionment.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. &#8258;49.]

In Equity. Suit by the Pennsylvania Steel Company and another against the New York City Railway Company and another, and three other causes. On distribution of proceeds of an action against Metropolitan Securities Company.

See, also, 117 C. C. A. 560, 198 Fed. 778.

The following is the opinion of the special master:

This is an accounting had under the decree entered on the mandate of the Circuit Court of Appeal in accordance with the conclusion reached by it in the so-called "Apportionment Proceeding." See 198 Fed. 778, 117 C. C. A. 560. The provision is: "(2) The receiver of the City Company is also entitled to reimbursement from said share for the expenditures made upon the Twenty-Third Street loop and the First Avenue line of said Metropolitan System described in the foregoing findings of fact; and for all such *other* expenditures made and *obligations incurred* by the City Company prior to the appointment of receivers on September 24, 1907, for the purposes described in article XV of the lease made by the Metropolitan Company to the City Company, dated February 14, 1902, as shall hereafter be found due upon an accounting to be had upon further order of the court."

The purpose of the accounting is to determine these "other expenditures made and obligations incurred" prior to September 24, 1907.

The "share" from which reimbursement is to be made is the share by the

decree mentioned, accorded to the receivers of the Metropolitan Company from a fund which it defines and which is in the possession of the city receiver. "Expenditures made," are the payments actually made by the City Company prior to the receivership for the purposes indicated and what they are suggests dispute. "Obligations incurred" are those for the same purposes which prior to receivership had not been met by the City Company and which are asserted against the fund on the authority of the Hugh Thomas decision (206 Fed. 663, 124 C. C. A. 463) by its unpaid creditors either through the "Contract Creditors' Committee" or individually and to an extent to be indicated, but only to that extent by the city receiver himself.

A stipulation has been placed upon the record, which classifies in three groups, numbered I, II, and III, items appearing in construction accounts, which were not only charged on the city books to the Metropolitan, but credited by the latter on its books to the former. Group I consists of nine conceded items aggregating $794,500.31, and each item comes within one or the other of five purposes specifically named in article XV of the lease. On the strict construction urged by counsel for the Metropolitan receivers and for the Guaranty Trust Company these constitute the only purposes for which expenditures made or obligations incurred are chargeable to the Metropolitan, even though the two companies had, prior to the receivership, agreed in the most formal manner that the expenditures made for purposes claimed not to be within any one of those five classes should be regarded as capital expenditures under the clause referred to and chargeable as such, and even though, I may add, they might justly be deemed to be for betterments. Group II consists of disputed items aggregating $644,830.50. All of these items appear on construction accounts charged on city books to the Metropolitan and on its books credited to the City Company, and many, if not all of them, are to be regarded as having been accepted by the Metropolitan through its directors as within article XV. They represent expenditures made and obligations incurred for services rendered and materials furnished prior to the receivership, and it appears from the stipulation as to the practice in making book entries that these materials prior to September 24, 1907, were actually used in what the parties had, by corporate action and by book entries or by book entries alone, agreed to be construction work under the article. It is here that counsel for the city receiver parts company with those creditors whose materials, though ordered prior to the receivership for purposes thus agreed to be for construction, were diverted by the receivers themselves to other purposes. Holders of obligations for materials actually used before September 24, 1907, for the agreed purposes, even if such purposes were not within the letter of the article, should, on this view, be paid from the fund, if used prior to the receivership, but only those, and to the extent that he opposes claims for materials subsequently diverted he is in accord with counsel for the Metropolitan receivers and the Trust Company.

Taking up the grounds of objections urged by these latter to disputed items and claims, it will be enough if I indicate briefly conclusions respecting them without dictating arguments fully presented in the briefs. I dispose of them shortly because I think that both the lower and appellate courts have in the action at law ([C. C.] 164 Fed. 144, and 173 Fed. 269, 97 C. C. A. 435), as well as in this apportionment matter (198 Fed. 778, 117 C. C. A. 560) and in the Thomas Case (206 Fed. 663, 124 C. C. A. 463), indicated conclusions which do not justify the contentions.

The first contention is that the expenditure or obligation must be for one of the five specified purposes before referred to. To this I do not agree. What the parties have agreed to be properly chargeable to capital account is within the article by its own terms whether originally debatable or not. In construing the section Judge Ward says ([C. C.] 164 Fed. 150): "The City Company and the Metropolitan Company might alter as they chose the nature of the expenditures. * * * *Whatever the Metropolitan Company agreed upon as a capital charge was to be a capital charge.* The parties could change and rechange the character of the expenditures as much and as often they pleased without in any way affecting the liability of the Securities Company." This was only saying that the practical construction placed by the parties themselves on this clause of their contract is conclusive not only on each other, but on an outsider interested in its interpretation.

The second contention is that the findings of fact in the action at law and the books of the Metropolitan Company upon which they were based are not conclusive as to the expenditures made and the obligations incurred by the City Company between May 1, and September 24, 1907, for the purposes described in article XV of the lease. Doubtless the finding of fact and conclusions of law are not res adjudicata as to any of the parties here not parties to that action, and such parties are at liberty, if they can, to show the facts to be other than found, but the law suggested by those facts as declared by the court and affirmed on appeal controls here and in the court below if the facts again appear and are not changed by different proofs. The same proofs are present here, being the entries on the books of both companies upon which the stipulation suggesting these findings of fact was based, and they are not falsified by counter evidence, although the Metropolitan receiver challenges them because they were made under the direction of an auditor and by clerks who were in the employ of both companies and because, as it is said, the Metropolitan was in the control of the City Company. I do not understand this latter to be a correct statement of the relation. Indeed the reverse is more nearly true, the exact truth being that both companies were at the times with which we are concerned, in the ownership so far as majority stock interest goes to the Interborough Metropolitan Company. However, even if the Metropolitan were controlled as asserted, these entries are admissible on the authority of the conclusion reached by the Circuit Court of Appeals in the Barber Asphalt Paving Co. v. Forty-Second St. M. & St. N. Co., 180 Fed. 648, 103 C. C. A. 614, that entries made under just such circumstances are prima facie evidence against the company on whose books they appear The entries themselves were made under the competent direction of an auditor, since deceased, who commanded the confidence of the court and of counsel for all parties in these litigations, and in making them he was but construing and applying the formal determination of the Metropolitan directors themselves that such expenditures made or incurred *were* within this article of the lease and a charge to capital account for which this company was obliged to issue its securities. To this end he was fully authorized, and on the record here I think the entries furnish conclusive proof of the assent of the Metropolitan that the services and materials entered were chargeable to it.

The final general contention urged by Metropolitan interests is that no claim for materials furnished or services rendered should be allowed unless the materials had, prior to September 20, 1907, gone into permanent betterments of the character described in the article in question. I do not agree with this proposition because I think that the status existing on the day of the appointment of the receivers determines rights in the funds. If prior to the receivership materials purchased by the City Company for purposes which the two companies had agreed were within the article had been diverted to operation (for which the Metropolitan was not to be called upon to pay) then it may be that neither the city receiver nor a creditor, for such unpaid for materials has any interest in the fund for the agreed value. When, however, such materials had not been diverted, it is clear that the contract price is allowable out of the fund to company or creditor, as the case may be, without any regard to use prior to the receivership. What the receivers may have done with such material on hand after they were appointed cannot affect rights accrued as of that date, a proposition which the claim of the National Conduit & Cable Company for materials which the receivers refused to take illustrates. The claim referred to is for cable ordered in May, 1907, for use in electrification of roads not theretofore electrified, which the Metropolitan directors approved as construction work within the article. The City Company did not refuse to take it prior to the receivership because none of the construction work authorized had been abandoned. The receivers rejected it because they determined to abandon such of the work as had not progressed so far as to make it inadvisable to continue it, and it included work on which this cable would on every presumption have been used if it had been continued. How can it be argued under the Thomas decision that this claim should not be met out of the fund because the materials were not used? The court distinctly says: "The lease and contracts show that the fund in question was provided for the purpose of reimbursement for expenditures—to enable the City Company to pay debts incurred by it in construction work—*and not for the purpose of paying it the value of improve-*

*ments made.*" (Italics mine.) This debt is a debt of the City Company provable against its assets, as the court has decided. 198 Fed. 746, 117 C. C. A. 503. It was contracted for that construction work which the Metropolitan Company had agreed to as a charge against it and which even counsel for Metropolitan interests here concede to be within article XV, i. e., change in motive power. The City Company had not, prior to the receivership, called for its delivery nor used it for any other purpose. On the 20th of September, 1907, therefore, it was a debt incurred by the City Company on construction work. What the receivers of the City Company did, upon that date, either with material then on hand delivered under the contract and unused or with the contract itself thereafter is immaterial.

What has been said in effect disposes of the objection of what I have called the Metropolitan interests to the items set out in group II of the stipulation. Every one of these items with the exception of item (s), which is disallowed, was credited on the books of the Metropolitan Company to the City Company as a construction charge to capital account which, I think, for reasons stated, brings them within article XV of the lease, the objection being that they are not within the strict letter of that article. Each represents services ordered and material furnished prior to the receivership which had actually been used for purposes specified, which the Metropolitan had thus agreed to be a capital charge against it. Many of them represent, in part at least, obligations incurred which were subsisting in outstanding claims of creditors on the 20th of September, 1907, and their allowance means the allowance of the claims, most of them being represented here, not only by the city receiver, but by the creditors themselves. Two of them, however, call for special comment, as contentions are suggested not before alluded to, these being the item (t) with the subdivisions for new revenue car bodies, new work cars, electric equipment of cars and car accessories, and item (u), which covers charges in connection with fire losses. The two seem interrelated, and I first take up the item of fire loss $101,246.63.

Under the lease the City Company was bound to restore or replace property destroyed by fire and during the existence of the lease down to the appointment of receivers it met all expenses of insurance. One would have supposed from this that the course pursued, when a fire occurred, would have been for the City Company to take the insurance moneys charging itself with the cost of restoration even where that cost exceeded the adjusted loss except when the restoration involved substantial betterments which the parties might have agreed to be chargeable under article XV of the lease. It was, however, clearly within the competency of the parties to determine how the obligation to restore should be discharged, even where the course adopted involved an apparent departure from the indicated course. The book entries show an understanding by which the Metropolitan took and was permitted to retain all insurance moneys in full discharge of the City Company's obligation to restore, the latter making the restoration, but charging the total expense to the Metropolitan, which credited the City Company with the expenditures, the corresponding charge on its books being to the particular fire loss account. As for the insurance moneys, the company probably used them for any purposes that pleased it, and that in any event is what it is stipulated the receivers, as Metropolitan receivers, did with such moneys. The practical effect of these entries is to establish an agreement by which the Metropolitan, in consideration of the payment to and retention by it of the insurance moneys, treated all expenditures made or obligations incurred by the City Company in restoration after a fire as construction work and a charge to capital account under article X of the lease, whether distinct betterments resulted or not. The item here in dispute represents, I assume, on the theory on which the books were kept, expenditures made and obligations incurred by the City Company for restoration in excess, not of insurance moneys, but of payments made to it by the Metropolitan Company on this capital account. It is an amount due under the agreement to be spelled out of such entries. Such agreement as the books show was the practical construction placed by the parties on the obligation to restore during the whole existence of the lease, and it had the approval of the Metropolitan Company through the formal action of its directors in settling accounts on May 22, 1907, containing charges against their company made on just such a basis. Moreover, that it resulted fairly to both parties is clear,

because in one case the Metropolitan or its receivers determined not to restore at all, while in another it effected a restoration of much greater value than the loss. If these book entries and the action of these directors are to be thrown aside, and rights and obligations are to be determined solely on the lease, without regard to what the parties did under it, as shown by those authorized entries, as Metropolitan interests are here contending that they should be, then on facts stipulated here the result reached in the Metropolitan breach of lease proceeding was erroneous. There the Metropolitan receiver conceded against its claim for failure to restore, a credit of insurance moneys paid, which was a concession of a general claim against his insolvent against a general claim in its favor against the insolvent City Company. But the facts stipulated here show that $1,253,617.79 of these insurance moneys for fires occurring previously were collected after September 24, 1907, when Metropolitan receivers were acting in the dual capacity of receivers of both insolvents. If, therefore, the contention as to these insurance moneys made here be adopted and, disregarding these book entries, it were held that in spite of them the City Company was entitled to these insurance moneys, then these subsequent collections are part of its estate to be paid in full from the Metropolitan estate, either by offsetting them against the dividend due it from the city estate, if large enough, or in cash. The allowance as an offset of a general claim against a general claim does not affect this result. Furthermore if it were thus paid in full, it would at once suggest particular funds in which creditors of the City Company, holding obligations incurred by it in fire restoraton, would, under the Hugh Thomas decision, have an interest which they might enforce. The item illustrates again the difficulties arising from a refusal to recognize the status existing on September 24, 1907, and from attempts to change it. I am of the opinion that the book entries are conclusive, that the item should be allowed as claimed, and that the claims of such creditors as that of Montgomery & Co. (123), Hastorf (120), and Brady (106), are likewise allowable if they are not included in it.

What has been said disposes of all objections to the subgroups under (i) in the printed stipulation which are based on the contention that as the cars and accessories were ordered after the destruction by fire of a very much larger number of cars, they must be regarded as replacements which the City Company was bound to make. That they were ordered *after* destruction is disputed as a fact, and the book entries do not treat them as replacement, but as new and additional equipment chargeable to capital account against the Metropolitan. These book entries I accept, but if they are to be regarded as replacements, they would still be chargeable to the Metropolitan if the disposition made of the charges in connection with fire losses be correct.

The disposition made of disputed items in the stipulation involves the allowance, to some extent, of obligations incurred for materials and supplies which might not have been actually used for construction on or prior to September 24, 1907, and which, being on hand on that day, have already been credited to the city receiver in the proceeding known as the interreceivership account. The decree in that proceeding provides for this contingency, however, as the report recommended that the allowance therein of the sum stated for materials, supplies, and repair parts on hand on September 24, 1907, should be "subject to the deduction of the amount of the claims of creditors who supplied such materials, supplies and repair parts which are allowed in the so-called apportionment proceeding."

In pursuance of the notice required to be given by the master by the order of July 29, 1913, 179 claims of creditors against the fund involved in this proceeding were filed with me within the time limited. Of the claims so filed there were withdrawn or dismissed 43 on which no record was made. Of those on which a record has been made 12 have been wholly and 5 partially withdrawn. Records have been made on 124 additional claims. Of these 10 have been briefed by counsel for creditors individually represented by counsel and 53 by counsel for the Contract Creditors Committee. Sixty-eight have not been briefed, but are summarized in the brief of counsel for the Metropolitan receiver. Conclusions already indicated dispose of many, if not most, of these claims. I take them in the order in which they are presented in the Metropolitan receivers' brief.

## Claims Independently Briefed.

The Brill Company (163). This is allowed at the amount claimed by the creditor in its brief $60,538.09.

Byrne & Murphy (172). This claim is allowed, but only to the extent of $1,390; the motion to dismiss for the amount claimed in excess of that sum being granted.

Eggleston Bros. & Co. (67). This claim, consisting of the three items aggregating $321.63, is allowed. The claim (66) discussed in creditors' brief for $573.12 was apparently charged prior to the receivership to "General Stores," and is not credited to the City Company on the Metropolitan books. I disallow it without prejudice to its assertion in the Preference Proceeding.

William T. Fitzgerald (167). This claim, consisting of two items aggregating $6,317.71, is allowed.

General Electric Company (162). This claim, consisting of five items aggregating $6,771.90, is allowed. Of the five, that representing an obligation incurred and outstanding at the date of the receivership for rewinding certain armatures, amounting to $5,792.34, is important as indicating the practice between the two companies when a fire occurred. Here a fire at a Forty-Second street carhouse, which occurred on March 4, 1906, a year and a half before the receivership, and more than a year before the settlement between the two companies in the spring of 1907, suggest the obligation. Of the obligation thus incurred $939.50 was paid by the city company to the claimant on April 16, 1907, the amount here claimed being an unpaid balance. This $939.50 was charged on city books to the Metropolitan, the supporting voucher distributing the charge as follows: "Metropolitan Street Ry. 42nd Street Fire Loss a/c." It was credited on Metropolitan books to the City Company, and in the intercompany settlement of accounts of April 30, 1907, was, by the formal action of its directors, directed by the Metropolitan to be paid, not out of a particular fire loss account, although insurance moneys were then on hand, but out of the general moneys furnished by the Metropolitan in pursuance of article XV of the lease for which it issued the very securities from which the fund under distribution here was derived. The facts suggesting this item emphasize the justice of the conclusion hereinbefore indicated respecting fire losses, and show clearly that the book entries are not to be regarded as the irresponsible acts of an auditor and clerks common to both companies, but as entries accurately and intelligently made by its agents, authorized after full consideration and in the most formal way, in pursuance of a construction of the article deliberately accepted by the Metropolitan Company itself.

The Lorain Steel Company (48). This claim is for $60,067.32. Counsel has divided it into 10 lettered groups. I have concluded that all of the items should be allowed as claimed for reasons heretofore suggested, the application of which will be clear to counsel, but the groups D, E, and K suggest special comment. Group D, covering special work aggregating $21,464, which was ordered for use in connection with the electrification of Twenty-Eighth and Twenty-Ninth streets, suggests a case where the item is disputed because the work was not used, having been abandoned either before or after the receivership. It was concededly ordered for purposes which counsel admit to be within article XV of the lease, and there is no evidence that prior to the receivership it was used for any other purpose. As it had not been used, it does not appear as a credit to the City Company on Metropolitan books, but it was an expenditure specifically authorized in May of 1907 by the Metropolitan as a charge against it. The material ordered in group E was ordered for the same purposes, but not delivered at all, the receivers refusing to take, whereupon it was scrapped. Metropolitan interests object to it because it never went into betterments, an objection which has been disposed of. As to group K and its first two items, I think that it would not violate probabilities if the presumption were indulged that one rail used on First avenue work was taken from the 10 delivered to the yard by claimant rather than from the only other 4 of the same kind that were there when delivery was made, and that the next 3 so used were taken from the 139 supplied by claim-

ant then in the yard rather than from these 4. This, if a resort to presumptions be necessary at all. If, however, they be regarded as among the rails on hand on September 24, 1907, the fact that they were then unused for construction is immaterial, provided they were bought for that purpose. The other two items of this group are clearly allowable for reasons discussed generally above.

National Conduit & Cable Co. (10). This claim has been hereinbefore discussed and disposed of as allowed.

National Conduit & Cable Co. (11). The payment of $11,122.80 under the order of October 3, 1913, was not, in my opinion, improperly made. The Metropolitan brief states that it was purchased in connection with the change in the Twenty-Eighth Street line, but not used until after the receivership when it was diverted to a purpose which it is urged was not within the article. This purpose was, I think, within the article, but what was done with it after September 24, 1907, is, in any event, immaterial. As to the next disputed items of $7,716.94 and $3,295.60 for cable used in connection with electric lighting necessitated by what was undeniably construction, and so treated by the parties, done on the Lexington Avenue building the record leaves it in doubt whether the work was done before or after the receivership. If done after, the reels were on hand on September 24, 1907, and having been originally ordered for what the parties had agreed should be construction, the items would be allowable accordingly. If done before, they were used for construction even though the use was temporary and they were so treated in the entries. That they should not have been treated thus cannot be said either, for it was an expense necessarily caused by construction and as much part of the cost as a necessary, but temporary, scaffolding would have been. After the receivership, when the temporary purpose was accomplished, the reels included in the larger item were used for a purpose which Metropolitan interests concede to be within the article, but the allowance of the item is not based on that fact. They are both allowed.

Pennsylvania Steel Co. (157). This claim is for $36,032.11, being an unpaid balance due on a contract for materials the agreed value of which was $96,290.87, which balance was duly allowed as a claim against the City Company. This agreed value was for materials for use in the change on First Avenue and Twenty-Eighth Street lines which are conceded to be within the article, and which were accepted as a charge against it by the Metropolitan. Of this agreed value $41,421.64 was paid by the City Company and a credit for that amount is conceded in the General Stipulation to the city receiver. The balance of $54,869.23 is, to the extent of this claim of $36,032.11, represented by an obligation incurred under the order of reference and by the difference of $18,837.12, being a payment by the City Company represented, I assume, in one or more of the disputed items set forth in the stipulation and heretofore allowed. Whether this assumption be correct or not is unimportant. What is clear is that of the $36,032.11 claimed here as unpaid $31,895.18 must be conceded since it was an obligation incurred for material on hand on September 24, 1907, bought for a purpose conceded to be within the lease. The difference of $4,136.93 is conceded by counsel for claimant to have been diverted by the City Company prior to the date named to maintenance purposes for which the Metropolitan was not chargeable, and I disallow it for that reason, without prejudice.

Post & McCord (160). This claim consists of four items, aggregating $11,880, which are allowed.

I. P. Sjoberg & Co. (Claims 5 and 6). These are allowed in the aggregate of $6,018. They have been heretofore indicated in connection with 7 of classification and (i) of the group II of disputed items set forth in the stipulation.

Sicilian Asphalt Paving Co. (21). The items aggregating $2,019.28, relating to paving at Essex street, Forty-Second street, The Bowery, Amsterdam avenue, and Columbus avenue between Fifty-Fifth and Fifty-Sixth streets are allowed. This claim is classified as an unbriefed claim in the brief of the Metropolitan receiver, but the creditor filed its brief with me, and it is included here for that reason.

Claims Briefed by Contract Creditors Committee.

There are 53 in number, and I indicate the disposition to be made of them in the order in which they appear in their brief.

Share & Trust Co. (137). This claim is allowed at $4,127. The material was ordered for use on the First Avenue and Twenty-Eighth Street construction, and none of it had been diverted to any other purpose prior to the receivership. That some of it was unused when it began is immaterial.

William Wharton, Jr. & Co. (145). This claim is for a balance of $31,052.28 due on three claims heretofore allowed against the city estate, the difference having been allowed as a charge against the fund and paid. I allow this balance with the following exceptions which are disallowed as a charge against this fund without prejudice:

Cast steel frog for 125th street and Amsterdam avenue........... 102
Crossover for Broadway and Houston streets.................... 3,920
Extension of tracks Kingsbridge Railroad....................... 3,825

The total of these items, $7,847, taken from the balance claimed, leaves $23,205.28 at which the claim of this creditor against the fund is adjusted.

Schoen Steel Wheel Company (136). This claim, aggregating $20,819, consists of three items. The item (1) for 183 steel wheels amounting to $4,419 is disallowed without prejudice because it does not appear that they were ordered for purposes that the Metropolitan accepted as construction purposes. The only inference from the evidence is that they were ordered as supplies. The two other items, aggregating $16,400, are allowed against the fund.

Sterling Meaker Company (139). This is allowed as claimed at $1,766.52.

Brady Brass Company (10). This claim is allowed at $885.81. I think that it is for the Metropolitan interests to show that materials credited on Metropolitan books to the City Company as expenditures for capital were diverted to other uses prior to the receivership. There is even a presumption that this material *was* used before September 24, 1907, for the purpose for which it was bought.

E. W. Bliss Company (102). The only other objection to this claim of $300.-30 not hereinbefore overruled is that it was not originally allowed as a claim against the City Company, although it was allowed against the Metropolitan. This was doubtless accidental, and because in the very early days of the receivership the relation of a creditor to the two companies had not been defined, though it soon was on the report in the matter of National Conduit & Cable Company, which the court accepted. See 97 C. C. A. 185, 172 Fed. 659. Claims were originally filed against the Metropolitan, which were in reality claims against the City Company estate, and they were subsequently allowed against that estate, under the decision referred to. That disposition of this claim should have been made at that time. That it was not is not important under the order under which I am acting, because such allowance is not made a prerequisite. To treat it otherwise would be unjust, as the creditor was not really in default.

Curtain Supply Company (108). This is allowed at $676.

Munson Bros. Company (125). This claim is allowed at $5,419.75. It is for material ordered for Twenty-Eighth Street electrification, and the Metropolitan brief states that it was never used, and intimates that it is probably still on hand. The contention of claimant, which that brief sharply questions, that the City Company had not the right, so far as the creditor was concerned, to divert material purchased for a purpose agreed by the companies to be a capital charge does not arise in this connection.

The Union Nut & Bolt Company (143). This claim for two items aggregating $539.80 is allowed.

Dayton Manufacturing Company (113). This claim is allowed at $2,551.21. The Metropolitan brief states it to be for $2,550.55, but the brief of claimant fixes a corrected amount, which I adopt.

In connection with an item of this claim amounting to $1,736 for 310 headlights for use on cars ordered, which they state to be still on hand, counsel for the Metropolitan receiver make a statement as to the general stipulation with which I do not agree. They say that it states that items which went

either into the general stores or construction stores were charged to those accounts, and were not charged to the Metropolitan Company until *issued*. The precise language of the stipulation is: "That no part of such material was charged to Metropolitan Street Railway Company in the said account unless and until it was *used* for one of the purposes covered by the subsequent classifications." I do not think that actual use is material if a charge was made and accepted, provided there was no diversion prior to the receivership, but if the court differ, it seems clear to me that under this stipulation the city receiver and the claimant are entitled to argue that materials were actually *used* and not merely *issued*, where they were charged. Both that receiver and claimants are so urging, and the stipulation justifies the contention.

H. W. Johns Manville Company (129). This claim is allowed at $215.33. The same objection is made to it that was made to the E. W. Bliss Co. claim (102, supra) that it was not allowed against the City Company, although allowed against the Metropolitan. It should be treated in the same way.

Continental Asphalt Paving Company (111). Allowed at $5.66.

O'Brien Bros. (130). Allowed at the aggregate of the three items involved, viz., $2.70.

Genasco Roofing Company (119). This claim involves two items, one for $151.81, which does not call for special comment, and is allowed. The other item is for $2,404.41, the agreed price of 600 barrels of paving pitch for construction work on First avenue and on Twenty-Eighth street, and so charged on city books and credited on Metropolitan books to the City Company. The stipulation shows that prior to the receivership 471 of the barrels were used for what has been agreed were construction purposes (N. B. The master's record shows a correction in red ink of 80 to 120, which meets the criticism of Metropolitan counsel that claimants' counsel are in error in their brief in stating that 120 were used.) The use made of the remaining 129 barrels is not shown, but they were charged as stated. There is, I think, an error in the statement in the brief that the invoices indicate that the material was to be used for stock. The stipulation containing this statement was expunged at a subsequent hearing, leaving the facts as above stated. As all the material was credited on Metropolitan books to the City Company as a charge to construction, I rule that as to these remaining 129 barrels the burden is on the Metropolitan receiver to show a diversion by the City Company prior to the receivership to purposes to which the Metropolitan was not chargeable. The claim is allowed at $2,404.41.

Smith & Wallace (135). This claim is allowed at $430.53.

Eichman & Co. (116). This claim is allowed at $1,060.

Charles Moser Company (124). This is allowed at $150.48.

Imperial Rubber Co. (122). This was originally allowed against the Metropolitan Company. The facts are the same in this respect as those suggested by the Bliss Company claim, supra. It is allowed at $84.92.

Douglas Taylor Co. (140). Allowed at $11.50.

Theodore Saudners (148). Allowed at $101.50.

Rail Joint Co. (171). Allowed at $192.50.

Warren Scharf Co. (146). Allowed at $245.53.

Robert Endore & Son (69.) Allowed at $9.

Devoe, Reynolds & Co. Allowed at one-half of $34.67, since counsel for creditor appear to concede the division.

Uvalde Asphalt Pavement Co. (142). Allowed in the aggregate of the two items claimed, which is $88.16.

Ramapo Iron Works (133). Allowed at $1,691.69.

Billings & Spencer Company (56). Allowed at $451.35, the burden being on the Metropolitan receiver to show diversion of the material prior to the receivership.

Barret Manufacturing Co. (100). Of this claim for $727.87 for 200 barrels of pitch, I allow the two items, aggregating $109.18, as prior to the receivership, the 30 barrels were used for construction, and so treated on the books. The further demand for $345.80, the value of 95 additional barrels, I disallow without prejudice. It affirmatively appears that these 200 barrels were ordered by the City Company for stock, i. e., as ordinary supplies. These 95 barrels had not been used when the receivers were appointed, but subsequent

to the receivership were used by them for what is undeniably construction, e. g., for completion of electrification of First avenue. Counsel for the Contract Creditors Committee contends that this use by the receivers gives the creditor rights in the fund which he otherwise would not have had, but I do not agree. On the 24th of September, 1907, these 95 barrels were supply materials and, as was decided in the Termination of Lease Proceeding, part of the assets of the city estate (190–609). When the receivers retained and used them thereafter, either for construction or operation, an obligation resulted in favor of that estate from the estate of the Metropolitan, but there is no basis in this for a contention that, when this resulting obligation was based on the use by the receivers of such supplies for construction purposes, it gave a supply creditor of the City Company a beneficial interest in the particular fund to be disposed of in this proceeding which he did not have by acts of lessor and lessee under the lease when it terminated. On September 24, 1907, to the extent of the agreed value of its 95 barrels, this creditor was a supply creditor of the City Company, not interested as a construction creditor in this particular fund, and nothing that the receivers did thereafter as receivers of either insolvent or of its estate could change its status. I therefore disallow this item without prejudice to the assertion of a claim for its amount in the Preference Proceeding.

Montgomery & Co. (123). This claim is allowed at $4.80. It has been heretofore disposed of in connection with the disputed item of fire loss charges classified as (u) in group II of the stipulation.

Duffy & Co. (16). This is allowed as the aggregate of the three items involved $336.51.

Rahman & Co. (137). This is allowed in the aggregate of the two items involved at $188.38.

Topping Bros. (141). This is allowed for $286.11.

Albert H. Hasborf (120). This is allowed in the aggregate of the three items claimed $136.80.

Carey Machinery & Supply Company (107). Allowed at $816.

Yellow Pine Company (147). Allowed in the aggregate of the two items claimed $4,227.62.

Clinton Point Stone Company (110). Two items are here involved, one for $553.29, which is allowed; the other for $115, which represents stone that counsel for the Metropolitan receiver says does not appear to have belonged to the claimant. The stipulation left standing in the master's minutes (pages 683, 684) apparently shows that it does, and I therefore allow it.

Phœnix Sand & Gravel Company (131). The two items of this claim aggregating $601.61 are allowed.

Sheridan Company (170). The several items of this claim aggregating $62.10 are allowed.

Barber Asphalt Paving Company (104). The aggregate of the four items of this claim $541.47 is allowed.

Vought & Williams (144). The aggregate of the six items of this claim $398.61 is allowed.

Richard Fitzpatrick (117). The aggregate of the two items involved is $619.69. One of the items $363.24 has been allowed under (r) of group II of the general stipulation, and is of course allowed in this connection. Counsel for the Contract Creditors' Committee refers to it as allowed under group II and also under one of the compromised items included in group III. I think, however, that the other item of $256.45 must have been intended as the item compromised since (r) of group II specifically allows to Richard Fitzpatrick $363.24 for carting. If this be correct, one-half of this latter item only should be allowed. The matter can be settled on the settlement of the report.

Bishop Gutta Percha Company (90). The aggregate of the three items ($574.42) involved is allowed.

Burnett Company (105). The aggregate of the seven items of which this claim is made up is allowed, $1,114.84.

East River Mill & Lumber Company (115). The aggregate of the three items composing this claim is allowed at $1,846.69.

Consolidated Car Heating Co. (71). This is allowed at $1,740.

The Metropolitan receivers' brief includes, among claims not briefed, seven claims which have since been very fully briefed by counsel for the Contract Creditor's Committee. These are taken up in the order in which they appear in the latter's brief.

American Brake Shoe & Foundry Company (99). The aggregate of the claim of three items is $996.57. Two of the claims, those of $92.61 and $145.83, are allowed. The third, of $758.13, calls for special comment, as it differs in some features from those heretofore considered, and determines larger claims. This claimant, between May 31, 1907, and August 22, 1907, delivered 3,500 manhole covers at a Thirty-Second Street yard, which are unpaid for. Between the earlier date and September 24, 1907, other similar covers, not furnished by claimant, presumptively paid for, were delivered at the same yard to the number of 980. The total of 4,480 were all that were in the yard during these times, and from these withdrawals were made from time to time, aggregating 2,160 which it is agreed were *not* used for construction purposes. Out of the remaining 2,320, 423 *were* used for purposes which the companies treated as construction uses, 407 of the 423 for Marginal Street and First Avenue construction being for purposes conceded by the receivers to be within the article. I may add to these facts that it does not appear that any of these covers were purchased for a specific purpose, as much of the material claimed for and allowed herein was. Thus there is suggested a question of fact which can only be solved by a resort to formal rules. That question is, Were these 423 covers taken from the 2,320 unpaid for covers furnished by the claimant? or were they taken from the 980 paid for covers furnished by others?

I think on these facts, that the claimant has made a prima facie case, and that the burden is on the two receivers to show that the withdrawal of the 423 covers used for construction was made from the 980 covers furnished by others, which were paid for, rather than from these 2,320 not paid for. Payment is always a defense where the circumstances are such as to leave a doubt that payment has been made, and where the City Company acting now for itself and again for the Metropolitan, and as its agent, purchased material in both capacities and chose to mingle them in such a way that neither it nor its principal is able to identify those used for the latter's purposes as those paid for, then, I think, that the loss, if there be a loss, was caused by its agent's act, and must fall on the Metropolitan estate. To hold otherwise would involve an injustice to this creditor, for, if not entitled to a presumption here, he would not be entitled in the "Preference Proceeding" to a presumption that his 423 covers had been used for supplies and thus, through no fault of his own, but because of the default of the City Company in not in some appropriate way preserving a distinction which under the lease it was bound to do, he would fall between two stools, and be reduced to the condition of a general creditor of the City Company's estate. This would do violence to the intention of the court, District and Circuit, worked out with patience and care in the Apportionment and Preference Proceedings, that creditors for materials should be paid in full, either as construction or supply creditors. This claimant to the extent of this $758.13 is clearly one or the other. I allow the amount as a construction claim.

Davies & Thomas Co. (114). This claim is for $6,847.96. On the 24th of September, 1907, the City Company owed the claimants $29,372.99 for materials. The latter had in their yards on that date materials not delivered of the agreed value of $22,525.03. Of these $11,432.22 had not been paid for, and it is a matter of inference from the stipulation that the difference of $11,092.81 had been paid for. I take the view that what was done after the receivership, if important, was that the claimants canceled that part of the debt due for materials then in its possession, which were unpaid for, thus reducing the debt for materials which they had actually delivered to the City Company to $17,940.76, and that they credited against this debt the price as previously paid for the balance of the material in their possession on September 24, 1907, leaving the difference of $6,847.96, the amount of the claim.

This claim is developed in a long record which suggests many legal contentions elaborately argued by counsel for claimants. On the record it is enough to say that it shows that of all the material actually delivered to the City Company prior to the receivership of the above-mentioned contract value of

$17,940.96, which includes this difference, $15,474.45 was actually ordered for the electrification of the First Avenue and Twenty-Eighth and Ninth Street lines, and that the balance of $2,466.31, though not ordered for these purposes, was actually used for them, before the receiverships. Of the legal contentions it is not necessary to say more than to state and pass on the ground of the objection urged by Metropolitan interests which the brief states as follows: "This claim, amounting to $6,847.84, is another one involving numerous and complicated items. * * * *The materials were used on the First Avenue line either prior to or subsequent to the receivership.* There is also a question whether certain payments made should not be applied to items for which a claim is here made. We suggest that the master make a ruling that only those materials which were actually used in the First Avenue electrification prior to the receivership, and to which there is clear evidence of nonpayment, should be allowed."

I have given the reason for thinking the evidence of nonpayment clear, based on the act of the receivers in agreeing to the retention by claimants of the materials in their possession on September 20, 1907, paid for and unpaid for, and in accepting a credit for the contract price against the total claim then outstanding. The balance remaining could not represent anything else than the amount unpaid on September 24, 1907, for the materials actually delivered on or prior to that date.

As to the ruling asked for, it is coupled with the statement, or admission, that the materials represented by this claim for $6,847.84 were not used on First Avenue electrification either before or after the receivership. But on the facts any not expressly ordered for that or a cognate purpose were used for such a purpose prior to the receivership, and those used thereafter were previously ordered for such a purpose, and must have been on hand on September 24, 1907. In either case, for reasons heretofore accepted, their agreed value would be payable out of the fund as obligations incurred for construction purposes. I therefore think that the ruling requested should be denied and the claim allowed.

Scranton Bolt & Nut Co. (138). This claim consists of many items which are set forth in one hundred and odd pages of the record, and the demands against the fund, aggregating $12,018.77, which they are said to suggest, are summarized under seven heads in the brief of counsel, which, for convenience, is here reproduced:

1. Material furnished by the claimant under orders given for the purpose of and actually used in the electrification of the First Avenue line ................................... $2,332 81
2. Material furnished under such orders for the purposes of electrification of the First Avenue line, actually used for that purpose and by presumption the material furnished by claimant under such orders ............................. 4,752 02
3. Material furnished under such orders for the purpose of electrification of the First Avenue line and the Twenty-Eighth and Twenty-Ninth Street Crosstown line being a balance actually of $2,097.15 and presumptively of $50.63 of that very material on hand and not used .............. 2,147 78
4. Work and freight with respect of the rethreading of track bolts ordered for the First Avenue line, but not shown to have been used and therefore presumptively on hand ..... 291 60
5. Material furnished by claimant but not shown to have been ordered specifically for any particular purpose, but actually used for the purposes of article XV of the lease .......... 95 51
6. Material actually used for various purposes of article XV of the lease and upon presumption material furnished by the claimant under orders not shown to have been given for any particular purpose ............................... 2,200 75
7. Material actually used for the purposes of article XV of the lease and charged on the books of the Metropolitan Company to it ........................................... 280 50

$12,018 77

Items summarized in the foregoing paragraphs 1, 3, 5 and 7 are allowable. Except as to the item of $50.63 mentioned in paragraph 3, they suggest no dispute, or at most a dispute that has been disposed of in connection with credits claimed by the city receiver. Items summarized in 2 and 6 suggest withdrawals from a mass of similar material, part of which, furnished by claimant, was admittedly unpaid for, and the balance of which, furnished by other than claimant, is by stipulation deemed to have been paid for. Their disposition turns on the presumption adopted in disposing of items considered in the two previous claims (114 and 99), and since the receivers have not shown that the paid for material was insufficient to meet withdrawals for operation, it will be assumed that the materials undeniably used for construction are represented in this unpaid claim due claimant. The items included in paragraph 4 are allowed, since the burden is on the Metropolitan receiver to show a diversion prior to the receivership of material admittedly ordered for construction purposes. It should otherwise be presumed to have been on hand on September 24, 1907. Counsel asserts that by mistake one of the claims here involved was allowed against the City Company for an amount $972.14 less than it should have been. This is not important. I have not, while writing, means of verifying the correctness of the statement, but, assuming its truth, its allowance against the City Company is not essential to the assertion of a claim based upon it against this fund, as has been held respecting two or three claims hereinbefore disposed of, which were not allowed against the city estate at all. Of course, the time for filing further claims against this fund has, under the order and the advertisement, long since expired, but this claim was filed within the time.

Thomas McClarnon (126). This claim is allowed at $6,539.89.

Watson Stillman Co. (97). This claim is allowed at $630.

D. A. Breen (106). This claim is allowed at $2,253.21.

Thomas Crimmins Contracting Co. (109). This claim is allowed at $1,416.38.

## Unbriefed Claims.

The following 61 claims not briefed by claimants are summarized in the Metropolitan brief:

Hammacher, Schlemmer & Co. (49). This claim is disallowed without prejudice to its assertion in the Preference Proceeding. All the material seems to have been ordered for stock, and none is shown to have been used for construction.

Same (50). This claim is allowed in the aggregate of all items involved at $154.93.

Dimock & Fink (65). Such of the items of this claim as are credited on Metropolitan books to the City Company as construction charges are allowed. The balance is disallowed without prejudice.

Gold Car Heating & Lighting Company (64). Allowed at $2,560.

Westinghouse Electric Company (84). The item of $295.91 in connection with the multiple unit car control is allowed, the balance of the claim being disallowed without prejudice.

Consolidated Car Heating Company (71). Allowed at $1,740.

Western Electric Company (155). This claim is disallowed without prejudice.

Isaac G. Johnson (24). Of this claim the item of $1,052.52, material for stock, is disallowed without prejudice, the balance of $1,968.27, the aggregate of five items, being allowed.

Virginia M. Flynn (17). Of this claim an item of $75.90 (line 179) is disallowed, the balance of $1,161.32 being allowed.

New York Telephone Company (127). This claim is disallowed without prejudice.

United States Wood Preserving Company (151). Disallowed without prejudice.

Estate of Joseph Moore (152). Disallowed without prejudice.

Vulcanite Portland Cement Company (153). Of this claim $777.92 are allowed, the balance being disallowed without prejudice.

John P. Kane Co. (154). Allowed at $116.

Harlem Contracting Company (156). Allowed at $72.48.

Eureka Fire Hose Company (1). Disallowed without prejudice.

George T. McLaughlin Company (2). $3,383.34 allowed. Balance disallowed without prejudice.

Atlantic Cement Company (3). The balance of $445.88 for bricks does not appear to have been charged to the Metropolitan, and was apparently used in repairs. Disallowed without prejudice.

Dittrick Jordan Electric Company (4). It may be that these armature coils were actually used for replacing after a fire (146th street), but the record does not show that they were regarded as a charge against the Metropolitan, nor that they were actually used in replacing. There is a stipulation that this claim may be asserted in the Preference Proceedings, so I dismiss it without prejudice.

White Manufacturing Company (7 and 51). The total of these claims is $9,060.14. Of the items the following are allowed, those remaining being disallowed without prejudice:

Items charged to Const. Store Yards..........................$  478 76
                  Met. St. Ry. % D 4..........................   195 40
                  Sec. I., Account D..........................   240 00
                  Met. St. Ry. % Sec. One.....................   335 00
                                   Sec. Two...................   161 00
                  96th and First Ave.......................... 2,800 00
                  Worth St. and Fulton....................... 1,093 00
                  Construction Store Yds.....................    499 49
                  Account D, First Avenue, Sec...............    194 41
                  Account D, First Avenue, Sec. 4............    305 08

In addition, there should be allowed the agreed cost of 300 manhole covers used on First avenue. The Metropolitan receiver, admitting that they were so used, says there is no evidence to show that they were used prior to the receivership; but the burden, I rule, is on him to show that they were used subsequently.

Candis, Smith & Howland (9). Allowed at $57.

Manning, Maxwell & Moore (13). Of the amount of this claim it does not appear from the record that more than $1,347.88, which I allow, was credited on Metropolitan books; but the Metropolitan brief states that the total $3,-657.29, represents the cost of tools, all of which were ordered for use either on repairs or replacements of property destroyed by fire at the Lenox Avenue car house. If the difference was charged to the Metropolitan and accepted by it, I shall allow it, otherwise not, as it seems to represent operating expenses. The accountants can examine the matter for the report.

William Kensler (18). Disallowed without prejudice.

John C. Rankin Company (19). Allowed at $133.

H. A. Welch (20). Disallowed without prejudice.

Sicilian Asphalt Paving (21). This claim is included in the Metropolitan brief among unbriefed claims, but a brief was filed by Mr. Kiernan, as counsel for the creditor, and it has been disposed of as hereinbefore stated.

International Steam Pump Co. (22). This claim is disallowed without prejudice.

Henry R. Worthington (23). Disallowed without prejudice.

Phœnix Fire Extinguisher Co. (27). This is a claim for material and services involved in the installation of a fire-sprinkling system in the car house at 129th street and Amsterdam avenue. There is a stipulation in the record that the items do not appear upon the general books, either of the city or Metropolitan, and that the amount, if allowed, is in addition to those covered by the accounts of the companies as they at present appear on the books. The testimony is that the work was done between August 20 and September 24, 1907, and it is not unlikely that the receivership intervening may account for the absence of entries. Work of this kind on that car house at that time was treated, as foregoing claims show, as construction chargeable to the Metropolitan Company. I think this should be thus treated, and dispose of

it accordingly, unless the stipulation placed on the record at page 243a at the suggestion of counsel for the city received means that the claim has been paid. The Metropolitan brief treats it as unpaid.

Grenson Mfg. Co. (29). Allowed at $277.

Hungerford Brass & Copper Company (30). This is disallowed without prejudice.

The record hardly justifies an inference that any of the copper was used for construction, and it was not bought for such purpose.

William J. Keubler, Receiver (18). Dismissed without prejudice.

S. Harburger (32). Dismissed without prejudice.

American Supply Company (33). Dismissed without prejudice.

Mutual Gas Light Company (35). Allowed at $40.50.

Walter McLeod Company (36a). Dismissed without prejudice.

India Alkali Works (38). Dismissed without prejudice.

Thomas F. Griffong (40). Dismissed.

Electric Service Supplies Company (41). Dismissed without prejudice.

Amsterdam Broom Company (42). Dismissed without prejudice.

Beckwith Chandler Company (43). Dismissed without prejudice.

Schaeffer Budenberg Company (45). Dismissed without prejudice.

Semon, Bache & Co. (46). Dismissed without prejudice.

James S. Barron & Co. (52). Dismissed without prejudice.

E. G. Long Company (54). Dismissed without prejudice.

Coe Manufacturing Company (70). Dismissed without prejudice.

Keasby & Matteson Company (73). Dismissed without prejudice.

W. H. Kings Company (74). Dismissed without prejudice.

Harmon & Dixon (75). Dismissed without prejudice.

Henry D. Sears (76). The material represented by this claim .for $231.35 seems to be charged to Construction Stone Yards on city books, but is not allowed as a credit on Metropolitan books. I allow it on the theory that the entry is an admission by the Metropolitan's agent that the material was bought for construction purposes. There is no evidence that it was diverted prior to the receiverships. Presumptively it was on hand.

Joseph K. Larkin (77 and 78). Disallowed as to $108.45 without prejudice, being claim (77). Claim 78 is allowed at $104.50.

Alfred Box & Co. (80). Disallowed without prejudice.

Buffalo Concrete Mixer Company (82). Allowed at $930.

Underhay Oil Company (83). Disallowed without prejudice.

Eugene H. Tomes (93). Disallowed without prejudice.

Cornell Construction Company (96). Allowed at $978.

Hildreth & Co. (98). That part of the claim $164.66 charged to operation is disallowed. It is difficult from the records to determine the amounts.

John W. Sullivan (158). Dismissed without prejudice.

Keuppel & Esser (161). Dismissed without prejudice.

Estate of Adolph P. Starke (164). The item of $212.50 is allowed. The item of $25.50 which the Metropolitan brief refers to appears from the record to have been withdrawn.

Coleman J. Mullen (165). Disallowed without prejudice.

All claims presented in the briefs filed have been disposed of, and I think they cover all claims suggested for disposition by the record. If, however, by oversight any have not been passed upon, omissions can be supplied on the settlement of the report. At that time, too, facts suggested by the new stipulations respecting the claims of the Scranton Bolt & Nut Company and the Phœnix Sand & Gravel Company can be taken up, and corrections respecting the Davies & Thomas Company claim, referred to in a letter of counsel for the Contract Creditors Committee, will be disposed of if disputed. There remains for notice only the demand of the city receiver for interest at 6 per cent. upon the expenditures and obligations from the date when they were made or became due to July 8, 1910. In the Hugh Thomas claim no such interest was allowed by the order directing the payment. That order controls here, not only as to obligations incurred, as in the Hugh Thomas Case, but as to expenditures made.

A proposed report may be submitted on March 15, 1915.

J. Parker Kirlin, of New York City, for Metropolitan St. Ry. Co.

James L. Quackenbush, of New York City, for New York City Ry. Co.

Dexter, Osborn & Fleming, of New York City, for receiver of New York City Ry. Co.

Byrne & Cutcheon, of New York City, for Pennsylvania Steel Co. and Degnon Contracting Co.

Davies, Auerbach & Cornell, of New York City, for Guaranty Trust Co. of New York.

Geller, Rolston & Horan, of New York City, for Farmers' Loan & Trust Co.

O'Brien, Boardman & Platt, of New York City, for John D. Crimmins and others.

Charles Benner, of New York City, for Ben. S. Catchings and others.

Simpson, Thacher & Bartlett, of New York City, for John I. Waterbury and others.

Strong & Mellen, of New York City, for Central Park, N. & E. R. R. Co.

Richard Reid Rogers, of New York City, for New York City Ry. Co. and Central Crosstown R. Co.

Masten & Nichols, of New York City (Arthur H. Masten, of New York City, of counsel), for receiver of Metropolitan St. Ry. Co.

John R. Abney, of New York City, for Molly Latta.

LACOMBE, Circuit Judge. This cause comes here upon exceptions to a report of the special master. Under previous proceedings a considerable sum of money came into the hands of the receiver of the City Company, which was divided into two shares, one to be delivered to the Metropolitan estate, the other to be retained by the city estate. A prior decree provided that out of the share going to the Metropolitan the receiver of the City Company should be reimbursed for certain expenditures made and obligations incurred by the City Company prior to appointment of receivers on September 24, 1907. A more specific statement of the questions presented will be found at the outset of the special master's opinion. "Obligations incurred" cover the claims of a great number of persons from whom the City Company bought materials of various sorts (or obtained services) for which, at the date of receivership, it had not paid. When the process of reimbursement puts in the hands of the city receiver money to pay any of these claims, the holder of such claim, under the Hugh Thomas decision (206 Fed. 663, 124 C. C. A. 463) may assert that such money is a trust fund which should be applied to the payment of his claim. Therefore the present report deals with a multitude of claims presented by various counsel. A perusal of the opinion will show what an extremely laborious task has been accomplished, practically the trial of very many separate actions. It is desirable that the opinion of this court upon the questions involved should be presented in some way which will not add to the complications already existing, and will submit to the court of review a few concrete propositions; when the opinion of that tribunal

as to those propositions is obtained, final disposition of all the claims may easily be had. On most of the propositions advanced in the report this court is fully in accord. In those cases where there is no such accord no attempt will be made to indicate the result upon individual claims by modifying the report as to such claims, because should the Court of Appeals accept the special master's conclusion, final disposition will be accomplished by a simple confirmation of the report as to such claims. Should that tribunal accept the conclusion of this court as to any such proposition, the effect thereof upon individual claims can be then determined.

[1] The questions presented involve the construction of certain articles of the Metropolitan-City lease. Since these are not set forth in full in the opinion of the special master, it may be convenient to quote them here.

Article XII provides:

"The lessee shall furnish to the lessor the sum of twenty-three million dollars ($23,000,000) for the purpose of paying the unfunded debt of the lessor, and providing for expenditures for improving, extending and equipping the lines of railroad and other property of the lessor and its subsidiary companies."

This sum of $23,000,000 was in due course furnished and spent; the article under which the present claims are advanced is article XV, which provides:

"The intention of this agreement is that the lessee shall pay not only the fixed charges of the lessor and the rental herein provided to be paid, but also *all sums of money properly chargeable to current maintenance and operation,* but if after the expenditure of such part of said sum of $23,000,000 as shall be available for additional equipment, improvements and extensions, *it shall be deemed expedient by the lessee to extend lines of railroad hereby demised or the lines of railroad of any subsidiary company, or to construct any branches of any such lines, or to provide any additional and increased equipment for or make any change of motive power upon, or any radical change in the construction, location or character of any such lines, then such expenditures shall be provided as follows:*

"(A) The lessee shall deliver to the lessor a written statement of the proposed expenditures, stating the approximate amount thereof and the purposes for which they are to be made.

"(B) If the parties hereto shall not within twenty days thereafter agree that such expenditures are advisable and are properly *chargeable to capital account* and shall not further agree upon the nature and amount of the securities to be issued by the lessor to provide for such expenditures, then the question upon which the parties shall have failed to agree shall be submitted to arbitration in the manner hereafter provided.

"(C) When such questions have been agreed upon by the parties or determined by arbitration, then the lessee shall provide the moneys required for the capital expenditures so agreed upon or determined, and the lessor shall issue to the lessee therefore such securities, whether stock, bonds or other obligations, as shall have been fixed by such agreement or arbitration and at the price and upon the terms so fixed.

"(D)  *  *  *  Any such obligations shall be subject to the provisions hereof relative to the funded debt of the lessor, and the lessee shall in no event be relieved from its obligation to pay 7% per annum upon the capital stock of the lessor.

"Nothing herein contained shall prevent the lessee from arranging for the extension, consolidation or refunding of any funded debt of the lessor  *  *  * or from advancing money to the lessor  *  *  *  for any expenditure chargeable as herein provided to *capital account,* or for any purpose not herein other-

wise provided for * * *; provided, however, that the lessee shall in no event be relieved from paying the guaranteed dividend of 7%! upon the amount of the capital stock of the lessor and the other fixed charges of the lessor as herein provided."

The prior decree, above referred to, directed reimbursement for expenditures made and obligations incurred "for the purposes described in article XV of the lease." No one of the claims now advanced, therefore, can be a basis for such reimbursement unless it represents supplies or labor "for the purposes described in article XV of the lease." The special master holds that supplies furnished by a claimant come within this category if, at the time they were ordered and received, it was the intention of the City Company to use them for the purposes described, although in fact they never were so used and were found among the unexpended  supplies when receivers took possession.

The opinion sets forth the reasoning by which this conclusion is reached, and the proposition is vigorously contended for in the briefs of the various parties, but the arguments are not found persuasive.

The word used in the lease is "expenditures"; it says nothing about "obligations"; the latter word makes its first appearance in the opinion and decree in the Apportionment Proceeding.   198 Fed. 778, 117 C. C. A. 560.  Let us take the simplest of the specified purposes—constructing a branch line, which lessor and lessee have agreed shall be built—and see what were the expenditures which the lessor was ultimately to pay.   They must be expenditures actually made for the purpose of the particular extension; that is materials used in that extension must be bought and paid for by the lessee, for clause C provides "the lessee shall provide the moneys required for the * * * expenditures * * * agreed upon."   Having done that, certain securities will be delivered by the lessor to lessee to reimburse the latter.   In other words there is to be a purpose, a use for such purpose and a disbursement—then we have an actual expenditure for the purpose.   Buying on credit, the lessee might, at any given time (such as date of receivership), be found in the situation where it had bought and used materials for the purpose of building the branch, but had not yet paid for them. In one sense this might not technically be an "expenditure," since money had not yet been actually paid out; hence we find that the decree above referred to provides for reimbursement, not only for "expenditures made," but also for "obligations incurred."   But that circumstance does not, as it seems to me, in any way modify the meaning which the word "expenditure" has in the lease.   If the City Company has not in fact *expended its money* for the special purposes—say for building the branch line—it must at least have *expended its supplies* for that purpose.   Until it has expended something there is no "such expenditure" which, as the lease provides, the lessor will issue securities for.

Overmuch seems to be made in argument of "intent" at the date of purchase of supplies.  To take a converse proposition as an illustration: Suppose the City Company had bought 500 steel yokes for renewal and repair work, and had charged them up to its supply account, but had not paid for them before receivership.  Suppose, moreover, that it

had actually used 100 of these very yokes in the new work on First avenue expressly referred to in article XV. Could it not demand reimbursement for them, and could not the man who sold 100 yokes, upon proving they were used for such purpose, maintain a claim against this fund—although neither he nor the City Company, nor any one else, at the time of sale and delivery intended that they should be so used? Having been used in that work they would be an "expenditure" of the City Company, and, not having been paid for, they would be an "obligation" for which reimbursement was to be made out of the fund.

It is suggested, in argument, that the Metropolitan might have issued the securities in advance, and the City Company have raised money on them for the purpose we are considering, viz., building a branch line, that if this had been done such money would be a trust fund not to be diverted to other purposes, and that supplies bought with such money could not be used for other purposes. The illustration is unpersuasive because nothing of the sort happened, nor so far as the lease shows was it contemplated. The course of business was for the lessee to go on and build the branch, using for the purpose supplies which it had purchased, itself providing the money to pay for supplies so used, and receiving securities from the lessor to make it whole for such expenditures. All the supplies which form the basis of the claims here presented were bought by the City Company on its own credit; the sellers knew nothing of the contract between the two companies, nor of any trust fund out of which they were to be paid. Pursuing the concrete example we have taken—a branch line which both lessor and lessee approved of: The City Company buys 10,000 steel rails, intending and expecting to *expend* them in building such branch. Subsequently, and before the branch is built, urgent repairs are needed somewhere, and 2,000 of the rails are used for that purpose. Certainly the use to which those 2,000 rails are put is not within the terms of article XV, and the concern which sold them to the City Company would have no claim against this fund for their price, although when they were bought the purchaser expected to use them for purposes within the terms of the article. It is understood that the special master and all counsel substantially agree to this. But if, after purchase, the purchaser was thus free to select to what use it would put the supplies purchased, it certainly remained free to make that selection, until their destination was finally determined by their being expended on some particular object. If it be granted that original intent alone does not absolutely determine the use to which purchased material must be put, and no one seems to argue to the contrary, then it seems quite clear to me that as to all supplies which were bought with intent to use them for one or other of the designated purposes, but which had not actually been used or expended and still remained on hand when receivership came, they were in the same situation as any other supplies bought also on City Company's credit, without any special intent and not actually used.

The special master has, in my opinion, attached too much weight to the entries in the books. Inasmuch as they were all made with the approval of the auditor of the Metropolitan, no doubt they evidence a willingness on the part of that company to pay the charges so made.

The Metropolitan might agree to pay any claim the City Company might make upon it, which was not forbidden by law, or obnoxious to good morals or to public policy; but it does not follow that all these entries of charge were made and audited with any intention to expand or modify this clause XV of the contract by "practical construction." A significant entry is referred to in respondent's brief. For the year ending June 30, 1907, the Metropolitan Company was charged with $24,185.57, representing 5 per cent. of the expenditures on account of injuries and damages for that year. "The theory upon which this was done was that there would be more injuries on a given street after electric lines had been established than there were during the preceding period." If the lessor company chose, it might pay some proportion of the lessee's losses from operating the road, but it would seem to extend the doctrine of practical construction beyond all reasonable limits to hold that an entry of that sort operated thus to modify the plain language of the written lease. The special master has been extremely liberal in allowing items claimed as expenditures under clause XV, such allowances as those for track connections required by the removal of the old tracks on Amsterdam avenue, and the placing of vestibules on cars are on the very border line. Nevertheless his decision on this branch of the case will not be disturbed except in the following instances:

[2] Allowance has been made for the full amount of various items of expenditures made necessary by a partial or entire loss of buildings by fire. Article V of the lease expressly provided that:

"The lessee will replace any of the demised premises or any addition thereto, which may be destroyed by fire or other causes."

This clause, which deals with a single subject is more specific than clause XV, which deals with several subjects and should control if there be any conflict between the clauses. But there is no such conflict, the clauses are entirely harmonious; the lessee is to keep the plant in fit condition at its own cost, but for betterments of the sort mentioned in clause XV it is to be provided with funds by the lessor. I do not see how any system of bookkeeping can operate to nullify the explicit provisions of clause V; there was a fixed obligation on the part of the lessee to restore what was destroyed. It may be that in the process of restoration improvements and betterments were made which might fairly be considered "additional and increased equipment." The correct rule would be to ascertain as to each building what would have been the cost of mere restoration and what was the cost of a larger and better building, the percentage of total cost representing betterments could thus be ascertained and applied to any individual item, allowance being made only for such improvement.

A similar situation arises in the case of certain cars. The City Company ordered 155 cars, substantially standard. Subsequently it directed that these should be new type, i. e., pay-as-you-enter cars, a more expensive type of car. It also ordered 40 other standard cars. If nothing had happened subsequent to these orders, these cars would have been "additional and increased equipment," and the City Company could have called upon the Metropolitan to provide the securities neces-

sary to raise the money to pay for them. It presumably was the original intent to place these cars on the road as an addition or increase; but long before their completion 280 cars were destroyed by fire. The City Company was bound by the lease to replace these at its own expense. It did not order 280 new standard cars to take their place; the cars under order would, therefore, as completed, become replacements until the loss was made good. The obligation of the City Company might fairly be limited to the replacement of standard cars. If some new and more expensive type were provided, the extra cost may be considered as coming within the classification of article XV. An application of the percentage rule above indicated would be the correct method of disposing of such P. A. Y. E. items as may be left after eliminating all such as fail by reason of the circumstance that they were not actually used before receivership.

It is thought that the findings in the action at law against the Securities Company are not controlling here—and that an item should not necessarily be allowed here as a charge under article XV because it was held to be such a charge in that action. In addition to the other reasons advanced—e. g., an action between different parties, etc., this circumstance may be noted. The action at law and the suit in equity against directors were both settled together in a single transaction upon payment of a lump sum of money. That sum was less than the aggregate amount of the judgment (with interest) in the one cause, plus the amount claimed in the other cause. Something claimed was waived manifestly, and it cannot be said, as to any single item now under discussion, that it is represented by cash to its full value in the fund with which we are concerned because it figured in the total for which judgment was entered against the Securities Company.

In all respects not covered by what has been above written the special master's findings and conclusions are confirmed.